UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOMATION CONTROLS
& ENGINEERING, LLC,

              Plaintiff,

                                    Case No. 19-CV-12724

vs.

                                    HON. GEORGE CARAM STEEH

FELSOMAT USA, INC. and
RYAN BERMAN,

              Defendants.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DOC. 4]

This matter is before the court on plaintiff Automation Controls &

Engineering, LLC's ("ACE") motion for preliminary injunction (doc. 5)

against defendants Felsomat USA, Inc. ("Felsomat") and Ryan Berman

("Berman"). The court held an evidentiary hearing on plaintiff's motion on

November 19 and 20, 2019 and both parties filed post-hearing briefs. For

the reasons set forth below, plaintiff's motion for preliminary injunction is

granted in part and denied in part.

## FACTUAL BACKGROUND

Defendant Berman has worked in the automation industry for over

twenty-seven years, during which time he developed relationships and sold

automation, robotics, and control systems and parts of such systems to numerous companies.   In 2000, he founded Matrix Design, Inc. ("Matrix") with two other partners. At Matrix, Berman's main tasks involved marketing, sales, and customer relation management.   He was heavily involved in designing, developing and overseeing the building and installing of automation systems for numerous clients.   In 2013, Berman sold Matrix and had to stay out of the automation business for two years under the terms of the sales agreement.

In 2015, a mutual acquaintance introduced Berman to ACE.   ACE is a "niche" company that designs and manufactures small to medium-sized automation and control systems.   ACE does not design or build machine tools.   ACE made an offer of employment to Berman to be its Vice President of Business Development conditioned on executing ACE's Executive Employment & Confidentiality Agreement ("Agreement").

The Agreement contains a provision prohibiting Berman from disclosing confidential information during his employment and for a period of five years after the termination of his employment.   Agreement at ¶ 2.2(a).   The Agreement also has non-compete and non-solicitation provisions, restricting certain activities during the term of Berman's

employment and for a period of two years thereafter.   Agreement at ¶

3.2(b).   Berman signed the Agreement on January 10, 2017 and began his

employment with ACE.

When Berman started at ACE, no existing accounts were handed

over to him.   The understanding of the parties was that all existing

accounts would remain with the other salesperson, Chris Mackey, and that

Berman would build his own book of business.   Many of the companies

that Berman contacted on behalf of ACE were companies with whom

Berman had a prior relationship.   Over the course of the next two years,

Berman made sales to various customers that were new to ACE, including

Systrand, Cummins, Husky Injection Molding Systems ("Husky"), ZF North

America, EMAG, Crown Equipment ("Crown"), and American Turned

Products, Inc. ("ATP").   Berman also sold projects to at least one of ACE's

existing customers, Thielenhaus Microfinish Corporation ("Thielenhaus").

On March 1, 2019, Berman resigned from his employment with ACE.

According to Berman, he resigned over dissatisfaction with his

compensation and because he believed that problems with delivery

schedules and quality at ACE were harming his reputation in the industry.

Berman's last day at ACE was March 15, 2019.

Berman signed an offer of employment as a Strategic Account Manager with Felsomat on February 27, 2019.   This job required Berman to manage and sell to a small number of customers as well as develop new opportunities and areas of business.   Berman met with ACE's President, Pete Lazic, after sending his resignation letter and said he was going to work for Felsomat selling machine tools and plant wide automation for big customers.   This is work that does not compete with ACE's business.

Chris Mackey conducted Berman's exit interview from ACE.   While employed at ACE, Berman used his personal laptop as his work computer. Mackey told Berman to return all ACE information, documents and records that he had on his computer or in hard copy.   Berman returned two boxes of paper files and a jump drive containing the ACE files from his personal computer.   Berman was not instructed to, and did not, destroy the ACE files from his computer.   These files include ACE drawings, quotes and communications with customers.

While working for Felsomat, Berman admits that he has developed and quoted several projects to companies he worked with while at ACE. However, Berman believed these projects were outside of the scope of the restrictions in the Agreement.

On June 4, 2019, upon discovering that Berman may be in breach of his Agreement, ACE sent cease and desist letters to Berman and Felsomat, demanding that Berman stop violating the restrictive covenants in the Agreement.   ACE contends that Berman has taken the goodwill and relationships he developed at ACE and turn them into sales for Felsomat. ACE seeks a preliminary injunction providing that Berman cease all contact with, but not limited to, the following ACE customers: Systrand, Cummins, Husky, ZF North America, EMAG, Crown and ATP.   ACE asks that the injunction also cover the customers ACE sought to do business with in the 24 months before the Agreement was entered, including but not limited to Thielenhaus.

The court held a hearing on plaintiff's motion for a temporary restraining order on September 30, 2019.   At the hearing, the parties agreed that the restrictive covenants in the Agreement are "valid and enforceable and that Defendant should comply with the requirements of the Agreement."   This language was included in the court's order providing for discovery and scheduling a hearing on plaintiff's motion for preliminary injunction (ECF No. 12).   The parties also identified projects that Berman already procured for Felsomat with Systrand and Cummins (ECF No. 11, p. 31-32).   Counsel for ACE stated that it was not seeking to stop this work,

and the Court stated, without objection, that "both sides appear to agree that those [projects] should be excluded from coverage under a preliminary injunction order or under the temporary restraining order, or both." (ECF No. 11, at 34-35).   There are two projects that are therefore excluded from the injunction sought by ACE: the Cummins $CO_2$ Valve Seat Automation project in China and the Systrand laser marking system project.

## STANDARD FOR PRELIMINARY INJUNCTION

The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court.   CSX Transp., Inc. v. Tennessee State Bd. of Equalization, 964 F.2d 548, 552 (6th Cir. 1992).   In determining whether to grant or deny an injunction, the district court is required to consider four factors:

1.   whether the movant is likely to prevail on the merits;

2.   whether the movant would suffer an irreparable injury if the court does not grant a preliminary injunction;

3.   whether a preliminary injunction would cause substantial harm to others; and

4.   whether a preliminary injunction would be in the public interest.

G & V Lounge v. Michigan Liquor Control Comm'n, 23 F.3d 1071, 1076 (6th Cir. 1994) (citing International Longshoreman's Ass'n v. Norfolk S. Corp., 927 F.2d 900, 903 (6th Cir. 1991), cert. denied, 502 U.S. 813 (1991).

# ANALYSIS

## I.  Likelihood of Success

ACE contends that Berman has breached the Agreement by contacting and doing business with certain ACE customers in violation of the non-competition and non-solicitation provisions contained in § 3.2(b). ACE also alleges a breach of the Confidential Information provisions contained in § 2.2 of the Agreement.

### A.  Non-Competition and Non-Solicitation Provisions

The restrictive covenants set forth in Sections 3.2(b)(i) and (iii) of the Agreement provide:

> 3.2. **Non-competition and Non-Solicitation Generally**. In recognition of the above recitals, in consideration of each party's execution, delivery and performance under this Agreement, the amounts to be paid to the Executive pursuant to the Executive's employment with the Company, and to more effectively to protect the value and goodwill of the assets and business of the Company, the Executive covenants and agrees that:
>
> * * *
>
> (b) During the term of the Executive's employment, and then thereafter for two (2) years, the Executive shall not, directly or indirectly . . . :
>
> (i) Call upon, contact, solicit or attempt to obtain business from any of the Company's present customers or customers with whom the Company did business or sought to do business (through proposals, sales calls, or other tangible efforts) within the twenty-four (24) month

period prior to the commencement date of this
Agreement, if such activities by the Executive would
compete with any business of the Company;

* * *

(iii) Call upon, contact, solicit or attempt to entice any
customer, supplier, or joint venture partner of the Company who
was a customer, supplier or joint venture partner of the
Company at any time during the twenty-four (24) month period
immediately prior to the Executive's termination of employment
to terminate its business relationship with the Company.

Section 3.2(b)'s restrictions cover the term of the Executive's

employment and the two years thereafter.   In this case, that time period is

from January 10, 2017 until March 15, 2021.   During that period, pursuant

to § 3.2(b)(i), Berman is prohibited from calling upon, contacting, soliciting

or attempting to obtain business from certain customers if such activities

would compete with any business of ACE.   The customers covered by the

restrictions include two groups: ACE's "present customers" and customers

with whom ACE "did business or sought to do business" within the 24

months prior to the date of the Agreement.

1.     Section 3.2(b)(i) – meaning of "present customers"

The parties disagree on the meaning of the phrase "present

customers."   James Carey, ACE's Vice-President, General Counsel and

owner, testified that the term "present customers" as used in Section

3.2(b)(i) includes ACE's customers when the Agreement was signed,

customers ACE obtained during the period of Berman's employment, and

customers ACE obtains during the two-years following the termination of

Berman's employment (ECF No. 40, Tr. 143).   Defendants contend that

the term "present customers" is limited to ACE's customers on the date the

Agreement was entered.

In interpreting a contract, the court's "primary obligation is to give

effect to the parties' intention at the time they entered into the contract."

*Innovation Ventures v. Liquid Mfg.*, 499 Mich. 491, 507 (2016).   Contract

language is to be given its plain and ordinary meaning and, so long as the

language of the contract is unambiguous, courts must interpret and enforce

the contract as written.   *Id.*   Therefore, courts may not read words into

plain and unambiguous contract language, *Northline Excavating, Inc. v.

Livingston Co.*, 302 Mich. App. 621, 628 (2013), or rewrite its terms "under

the guise of interpretation."   *Upjohn Co. v. New Hampshire Ins. Co.*, 438

Mich. 197, 207 (1991).

The word *present*, as it relates to a period of time, is defined as "now

existing; at hand".   Present, Black's Law Dictionary (11th ed. 2019).

Because the court is tasked with giving effect to the parties' intent at the

time they entered the contract, the date the parties signed the Agreement

in this case is the only reasonable interpretation of the word "present" for

purposes of defining "present customers." Therefore, "present customers" means ACE's customers at the time the Agreement was entered. Applying this understanding to ACE's present customers is reasonable because it distinguishes ACE's customers on the date the Agreement was signed from those with whom ACE "did business or sought to do business . . . within the twenty-four (24) month prior to the commencement date of this Agreement."

Any interpretation of the word *present*, other than being on the date the Agreement was signed, would require the insertion of words that are not included. That is, if on January 10, 2017, the parties intended "present customers" to include customers that ACE had not yet done business with but would at some time in the future during Berman's employment, the contract language would have to indicate that intention explicitly.

Reading the contract as a whole reinforces this interpretation. The Acknowledgements in Section 3.1 are concerned with the customer base ACE had developed *prior* to hiring Berman. Section 3.1 refers to ACE's "long term relationships with customers," § 3.1(a), and customers "who have used the services of the Company in the past and with whom the Company has become intimately familiar." *Id.* at § 3.1(b). "The vast majority of the Company's customers became affiliated with the Company

other than through the efforts of [Berman]." *Id.* at § 3.1(c). "The Company has expended substantial amounts of time and money to establish its *present* relationships with its customers." *Id.* at § 3.1(d) (emphasis added). Here, the term "present" clearly refers to those customer relationships in existence at the time the Agreement was executed and with respect to which the Company "has expended" resources, using the past tense to refer to work done by ACE and not Berman. Therefore, the court's interpretation of "present customers" is consistent with other indicators of the parties' intent throughout the Agreement.

If "present customer" is defined as described by Mr. Carey, it would lead to unreasonable and absurd results. For example, Berman would be obligated to inquire of ACE, for two years after leaving his employment, whether it has any new customers subject to Section 3.2(b)(i). Even if this was Mr. Carey's intention in drafting the Agreement, where the term at issue is unambiguous, one party's subjective understanding is irrelevant to determinizing the meaning of the plain language of the contract. *Harbor Park Market, Inc. v. Gronda*, 277 Mich. App. 126, 133 n.3 (2007). Furthermore, courts are instructed to avoid interpreting contracts in a manner that would impose unreasonable conditions or absurd results.

*See*, *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 286 Mich. App. 287, 297 (2009); *Bodnar v. St. John Providence, Inc.*, 327 Mich. App. 203, 223–24 (2019).

The court interprets the term "present customers" to refer to ACE's customers on the date the Agreement was entered.

        2.   <u>Analysis</u>

Plaintiff seeks a preliminary injunction requiring Berman to stop all calls and contact with any ACE customers, including Systrand, Cummins, Husky, ZF North America, EMAG, Crown and ATP.   Plaintiff also seeks a preliminary injunction requiring Berman to stop all calls and contact with any customer ACE sought to do business with during the 24-month period prior to his employment through the date of the termination of his employment including, but not limited to, Theilenhaus (ECF No. 44, PageID 1245; ECF No. 47, PageID 1894).

The restrictions in § 3.2(b)(i) apply to two groups of customers - ACE's "present customers" and customers ACE did business with or sought to do business with in the 24-month period before the date the Agreement was entered.   Of the eight customers identified in the previous paragraph (Systrand, Cummins, Husky, ZF North America, EMAG, Crown, ATP and Theilenhaus), Carey's testimony supports the conclusion that

none was an ACE customer on the date the Agreement was signed, and only Thielenhaus, EMAG and ZF were customers ACE did or sought to do business with in the 24 months prior to the Agreement being signed (ECF No. 40, Tr. 182-190).

With respect to both EMAG and ZF North America, in the 24-month period prior to January 10, 2017, ACE submitted one quote, but did not obtain any business (ECF No. 40, Tr. 190).   Berman argues that ACE has no protectible interest with respect to these customers.   MCLA § 445.774a (to be enforceable, restrictive covenants must protect an employer's "reasonable competitive business interests.")   During the same period, ACE had orders for spare parts and an electrical panel with Thielenhaus. Berman points out that none of the prior sales to Thielenhaus involved automation work and the total value for the orders was only $21,490. Berman argues that this *de minimis*, non-automation business is insufficient to establish a protectable interest as to Thielenhaus.

One concept that both sides made clear during the preliminary injunction motion hearing is that cultivating relationships with customers in this business takes time.   This concept is incorporated into the Agreement. The contract language is clear that the restrictions in § 3.2(b)(i) apply to customers ACE sought to do business with through proposals, sales calls,

or other tangible efforts.   First, the restrictive covenant uses the word "business" and does not specify automation business or a certain monetary threshold.   The fact that the sales to Thielenhaus were small and non-automation does not mean that the efforts on the part of ACE would not have culminated in a larger automation project in the future.   Similarly, it is not detrimental to § 3.2(b)(1)'s restrictions that the quotes sent to EMAG and ZF North America did not result in any business.   The important factor is whether ACE made efforts to do business with the companies.

Section 3.2(b)(i) restricts Berman from calling upon, contacting, soliciting or attempting to obtain business from EMAG, ZF North America, Thielenhaus, and any other customers who are covered by the language as it has been interpreted by the court, if such activities by Berman would compete with any business of ACE.

There is a question over how the parties are supposed to know what activities on the part of Berman "would compete with any business of [ACE]" (emphasis added).   While the Agreement does not expressly define the business Berman may not compete with, it uses the words "any" and "ACE" as descriptors.   There was some testimony from Carey regarding the types of jobs ACE does and doesn't handle.   For example, Carey

testified that ACE does not do machine tool work (ECF No. 40, Tr. 147).

He testified that ACE generally does automation work valued between

$300,000 and $2 million, *id.* at 147-48.   Berman has not disputed this

characterization of ACE's business.   Berman argues that it would not be a

breach of this subsection for him to solicit work that ACE is not seeking or

being considered for by a customer.   However, the language of the

Agreement does not support this interpretation.

Section 3.2(b)(iii) applies to a different group of customers, namely

ACE's customers during the 24-month period immediately prior to the

termination of Berman's employment.   The purpose of this section is to

prevent Berman from disparaging ACE to its most recent customers.

During his employment and for two years thereafter, Berman may not call

upon, contact or attempt to entice any such customer to terminate its

business relationship with ACE.   At the hearing on the motion for

preliminary injunction, Carey testified that none of ACE's customers have

terminated their relationships with the company (ECF No. 40, Tr. 152).

The most Carey articulated was a general fear that leads with some

customers are drying up.   This is not entirely surprising when the person

who developed the relationship with a customer leaves his employment

with the company.   ACE has not come forth with any evidence that

Berman has disparaged ACE to its customers.   ACE has not shown a likelihood of success on its allegation that defendants breached this subsection of the Agreement.

      B.    <u>Confidential Information Provision</u>

ACE also seeks a preliminary injunction providing that Berman and Felsomat immediately stop using ACE's Confidential Information while the case is pending (ECF No. 44, PageID 1245; ECF No. 47, PageID 1894). Section 2.1(a) defines Confidential Information to include "customer lists, mailing lists, and/or lists of actual and potential customers."   Section 2.2(b) separately prohibits Berman from disclosing to any entity, or from using for his own benefit, the names of ACE customers.   The Agreement provides that Confidential information generally does not include information: (i) already known to the public or within the industry; (ii) known to Berman from a source other than ACE; and (iii) unrelated to the business of ACE and independently developed by Berman without assistance of ACE.   *Id.*

The parties are negotiating a protocol for the inspection of Berman's personal laptop that he used while he was employed at ACE.   This is also the subject of a motion to compel pending before the magistrate judge. Without information provided by a forensic inspection of the laptop, ACE argues that Berman may have accessed Confidential Information from the

laptop which he used to obtain projects with Cummins and Systrand. While ACE has agreed that it is not seeking to enjoin Felsomat from working on those projects, ACE still has an interest in enforcing the confidentiality clauses and enjoining future violations.

Berman admits that after he joined Felsomat, he opened ACE documents on his computer for the purpose of approaching ACE about taking over an automation project for Crown Equipment that Berman heard was going poorly. Berman testified he opened "maybe a dozen" files regarding a robotics cell project he had sold to Crown while at ACE. He reviewed the files to prepare for a Felsomat meeting to determine if it made sense to offer to buy the Crown project from ACE (Ex. 41, Tr. 7-9).

Berman also testified that he provided Felsomat with a list of potential projects when he first started working there. The list included the Crown project, but Berman did not remember if it included projects for any other ACE customers (Ex. 41, Tr. 9-10). Defendants have not produced the list of potential projects, which Berman testified he had in his business documents (Ex. 41, Tr. 10).

Finally, ACE contends that Berman was able to sell the Cummins $CO_2$ Valve Seat Automation project for Felsomat only because he knew about the opportunity while he worked at ACE. ACE argues that the only

way Berman was able to close the deal with Cummins so quickly after going to Felsomat was because of his knowledge of the project obtained while at ACE, which makes it a misuse of ACE's confidential information. ACE makes a similar argument that Berman used its confidential information to win the Systrand laser marker project for Felsomat.   Ace contends that defendants have not produced the discovery necessary for ACE to identify what confidential information Berman specifically used to win these two projects.   While ACE is not seeking to enjoin defendants from working on the Cummins and Systrand projects, any violations of the Agreement are relevant to support injunctive relief from further violations of the Agreement.

Berman's response is that he knew the names of these customers before he joined ACE and that Felsomat already had a relationship with some of the customers when Berman joined.   Therefore, Berman argues that this information is exempt from the Agreement because he learned it from sources other than ACE.   However, the evidence shows that Berman did more than share the names of customers with Felsomat.   By his own admission, he shared information that he learned about the customers' projects and needs while he was employed at ACE.   ACE has demonstrated a likelihood of success on the merits that Berman violated

the Agreement by disclosing confidential information to Felsomat and/or by using such confidential information for his own benefit.

II.  Irreparable Harm

It is well settled in the Sixth Circuit that "[a]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992).  "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."  *Id.* at 512 ); *Michigan Bell Tel. Co. v. Engler,* 257 F.3d 587, 599 (6th Cir.2001).  "Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer."  *Basicomputer Corp.*, 973 F.2d at 512 (citation omitted).

If Berman were to solicit business from any of the restricted customers under § 3.2(b)(i) that competed with ACE's business, or use the knowledge he developed at ACE about the needs of customers he worked with while employed there, it would result in a loss of the customer goodwill developed by ACE.  The non-solicitation and non-competition provisions, as well as the confidentiality provisions in the Agreement are there to protect ACE so that it is not "forced to labor under the burden of unfair

competition as a result of the informational asymmetry presented by its direct competitor having an employee with intimate knowledge of its operations." *Kelly Services, Inc. v Noretto,* 495 F. Supp.2d 645, 659 (E.D. Mich. 2007). Because the resulting losses potentially suffered by ACE are so indefinite and speculative in scope, the harm is irreparable. *See, Chem–Trend v. McCarthy,* 780 F.Supp. 458, 463 (E.D. Mich. 1991).

In § 5.1 of the Agreement, Berman acknowledges that if he violates any of his obligations, it may cause ACE "irreparable harm which may not be compensated for by money damages." That section goes on to provide that in the event of any actual violation of the Agreement, ACE is entitled to preliminary and final injunctive relief to prevent any further violations.

III. Balance of Harms and Public Interest

The parties in this case entered their relationship with the hope of working together for a long time, but also with the idea of protecting their client bases if things did not work out. This was first and foremost in their minds when they entered the Executive Agreement. ACE wanted to protect its existing customers and those in the pipeline, while Berman wanted to ensure that he would not be blocked from working with the customers he had developed relationships with over the course of his long career in automation. At the hearing on the motion for preliminary

injunction, ACE argued that Berman must not have contact with *any* of ACE's customers, including those Berman brought to ACE.   Berman argued that ACE does not have a protectible interest in any of the customers at issue and that Berman's knowledge of the customers and the automation business was developed before he worked for ACE. Both of these positions are extreme and neither is supported by the language of the Agreement or the facts.

The public interest is served when competition is preserved and the parties' legitimate business concerns are protected.   Entering a preliminary injunction in this case accomplishes both goals.

## CONCLUSION

Plaintiff's motion for preliminary injunction is GRANTED in part and DENIED in part, in accordance with this opinion and order and as summarized below:

First, Berman is contractually bound to abide by all terms and restrictions in the Agreement, as interpreted by the court.

Berman is ENJOINED, while the case is pending, from seeking small to medium-sized automation and control systems work valued between $300,000 and $2 million from ACE's present customers on the date of the Agreement or customers with whom ACE did or sought to do business in

the 24-month period prior to the Agreement, as such work would compete with ACE's business in violation of § 3.2(b)(i).   However, Berman may solicit business from EMAG, ZF North America and Thielenhaus, or any other customer described in § 3.2(b)(i), for machine tool work or large-scale automation work or other work that does not compete with any business of ACE.   In addition, Berman is not prohibited from soliciting or attempting to obtain business from customers he brought to ACE, including Systrand, Cummins, Husky, Crown and ATP, as long as in doing so he does not violate another restriction in the Agreement.

Berman is ENJOINED, while the case is pending, from violating Article II of the Agreement regarding the use of ACE's Confidential Information.

It is so ordered.

Dated:   February 14, 2020

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
February 14, 2020, by electronic and/or ordinary mail.

s/Brianna Sauve
Deputy Clerk